RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SAMANTHA GRAF,

*Plaintiff-Appellant*,

*v.*

No. 24-5798

MORRISTOWN-HAMBLEN HOSPITAL ASSOCIATION;
SHIELD AND BUCKLER SECURITY, INC.,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:22-cv-00070—Charles Edward Atchley, Jr., District Judge.

Argued: July 31, 2025

Decided and Filed: September 10, 2025

Before: MOORE, GRIFFIN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Heather Moore Collins, HMC CIVIL RIGHTS LAW, PLLC, Nashville, Tennessee, for Appellant. Jay W. Mader, ARNETT, BAKER, DRAPER & HAGOOD, LLP, Knoxville, Tennessee, for Appellee Morristown-Hamblen Hospital Association. **ON BRIEF:** Heather Moore Collins, HMC CIVIL RIGHTS LAW, PLLC, Nashville, Tennessee, for Appellant. Jay W. Mader, Paul E. Wehmeier, ARNETT, BAKER, DRAPER & HAGOOD, LLP, Knoxville, Tennessee, for Appellee Morristown-Hamblen Hospital Association.

─────────────────

## OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge. While working as a Certified Nursing Assistant Technician at Morristown-Hamblen Hospital Association ("MHHA"), Samantha Graf

lodged a complaint of sexual harassment with a representative of the hospital's human-resources department.  According to Graf, during a lunch break and on hospital grounds, one of the hospital's security guards, Thomas Ogle, had raped her.  After conducting a limited investigation into the complaint, the HR representative determined that the sexual interaction between Graf and Ogle had been consensual.  Shortly thereafter, MHHA terminated Graf on the grounds that she had violated hospital policy by having intercourse while on the clock and in an unauthorized area.

Graf filed suit against MHHA alleging violations of Title VII and the Tennessee Human Rights Act ("THRA") and bringing various state tort claims.  Two of those claims—Graf's retaliation claim and her claim of negligent infliction of emotional distress—survived summary judgment.  Prior to trial, MHHA moved for the admission of a variety of evidence of Graf's sexual history pursuant to Federal Rule of Evidence 412(a), including evidence of Graf's relationship with Ogle.  The district court denied in part and granted in part the motion, allowing MHHA to introduce evidence of Graf's communications with Ogle prior to and following the alleged rape.  The case proceeded to trial, and a jury returned a verdict in favor of MHHA on all counts.

On appeal, Graf challenges the judgment against her, arguing that the district court erred as a matter of law in interpreting Title VII to require that she prove that she did not consent to the alleged rape.  And she argues that the district court abused its discretion in admitting a variety of evidence of her sexual history and predisposition, in violation of Federal Rule of Evidence 412.  But because the district court accurately interpreted the requirements of Graf's Title VII retaliation claim, and because it did not abuse its discretion in allowing the admission of limited evidence of her sexual history, we **AFFIRM**.

## I.  FACTUAL BACKGROUND

### A.  Graf's Sexual Harassment Complaint

Samantha Graf, a certified nursing assistant, was hired as an Emergency Room Technician by MHHA in 2020.  R. 266 (Trial Tr. II at 5) (Page ID #7705).  Graf's duties

included performing vitals, working directly with doctors and nurses, and responding to crises, such as by performing CPR. *Id.* at 7 (Page ID #7707).

In the emergency room, Graf worked alongside security guards who were often stationed in the department to ensure the safety of staff and patients. *Id.* at 6 (Page ID #7706). The security guards were employed by Shield and Buckler Security, Inc. ("SBSI"), a third-party security firm that MHHA had contracted for its security needs. R. 262 (Trial Tr. IV at 41) (Page ID #7447). Graf became friends with many of the security guards, including Thomas Ogle and his supervisor, Joe Sutton. R. 266 (Trial Tr. II at 46) (Page ID #7746).

Records obtained during the discovery process indicate that Graf and Ogle began texting on June 19, 2021. *Id.* at 47 (Page ID #7747). The two exchanged hundreds of texts over the course of the next several months. *Id.* at 47–59 (Page ID #7747–59). According to Graf, the two were "work friends, and that was it." *Id.* at 9, 81 (Page ID #7709, 7781). But according to Ogle, although the relationship started off friendly, the two began discussing that they "were both part of the BDSM world" and having intimate, sexual conversations. R. 262 (Trial Tr. IV at 108–09) (Page ID #7514–15). Graf admitted to having discussions with Ogle about various topics, including her past abusive relationships and intimate sexual matters, but stated that Ogle always initiated sexual conversations and that they never discussed having relations with each other. R. 266 (Trial Tr. II at 74–78) (Page ID #7774–78). The two also met "on a regular basis" during their breaks, meeting in a "numerous amount of spots" including stairwells around the hospital. R. 262 (Trial Tr. IV at 107–08) (Page ID #7513–14).

One day in June 2021, Ogle texted Graf and asked her to meet him for lunch. R. 266 (Trial Tr. II at 9) (Page ID #7709). Graf agreed to meet, and Ogle guided her to the security office—a location that was on the hospital's campus but where Graf was not authorized to be, *id.* at 66, 72, 74 (Page ID #7766, 7772, 7774)—via text messages. *Id.* at 9–10 (Page ID #7709–10). Graf did not clock out, because she was not required to do so during breaks, and she had a coworker cover her during the break. *Id.* at 8–9, 38 (Page ID #7708–09, 7738).

Once in the security office, Graf and Ogle began talking about work and their days. *Id.* at 10 (Page ID #7710). What occurred next is heavily contested, but Graf alleges that Ogle trapped

her legs with his, handcuffed her, raped her, and forced her to perform oral sex on him.  *Id.* at 10–11 (Page ID #7710–11).  Ogle, by contrast, contends that the encounter was a consensual sexual encounter involving role-play that the two had discussed ahead of time.  R. 262 (Trial Tr. IV at 116–21) (Page ID #7522–27).  Graf contends, and Ogle did not deny, that she said "no" and "stop" several times during the encounter.  R. 266 (Trial Tr. II at 10–11) (Page ID #7710–11); 262 (Trial Tr. IV at 119) (Page ID #7525).  But Ogle stated that the two had discussed safe words prior to the encounter, that that their agreed-upon safe word was not "no" or "stop."  R. 262 (Trial Tr. IV at 115, 119–20) (Page ID #7521, 7525–26).

According to Graf, following the encounter, she immediately went to the bathroom and cried, after which she returned to her shift.  R. 266 (Trial Tr. II at 11) (Page ID #7711).  She did not, on that day, tell anyone about the encounter, including family and friends, the hospital's HR department, or law enforcement.  *Id.* at 12 (Page ID #7712).

In the weeks following the encounter, Graf and Ogle continued to text each other frequently.  *Id.* at 12–13 (Page ID #7712–13).  Per Graf's telling, Ogle initiated all of the contact and was "very demanding," asking for explicit pictures and videos of her.  *Id.* at 13 (Page ID #7713).  Graf complied, contending that she "did not want to" but "was scared" and wanted "to appease [Ogle] and keep calm and save [her] job and not be assaulted again."  *Id.*  For his part, Ogle contends that the two sent explicit pictures and videos "back and forth as playful banter to each other as either teasing or showing something off."  R. 262 (Trial Tr. IV at 121) (Page ID #7527).  And Ogle alleges that he and Graf continued to meet in person after the alleged rape.  *Id.*

On October 29, 2021, Graf was having a conversation with Sutton—Ogle's supervisor and her work friend—when Sutton informed her that the hospital was investigating Ogle following a complaint of sexual harassment by another MHHA employee.  R. 266 (Trial Tr. II at 14) (Page ID #7714).[1]  Graf then told Sutton that Ogle had raped her.  *Id.*  Although Graf initially wanted her complaint to be anonymous, she ultimately agreed to tell Sutton's supervisors,

---

[1]Despite Graf's repeated testimony on this point, Sutton testified—both in his deposition and at trial—that he did not "believe" or "was unsure" but "d[idn't] think" that he had told Graf about any other complaints against Ogle.  R. 261 (Trial Tr. III at 119–21) (Page ID #7331–33).

Lieutenant Ray Lacy and Captain Jeff Ingram, about the assault. *Id.* at 14–16 (Page ID #7714–16). The next day, after meeting with Lacy and Ingram, Graf submitted a written statement detailing her recollection of the events and emphasized that the encounter was nonconsensual. *Id.* at 16–19 (Page ID #7716–19).

That same day, Lacy and Ingram met with Ogle about the complaints against him. R. 261 (Trial Tr. III at 82) (Page ID #7294). Ogle admitted to having sex with Graf, as well as having sexual encounters with other nursing staff. *Id.* Lacy and Ingram immediately collected Ogle's duty gear, relieved him from his shift, and terminated him that day. *Id.* at 82–83 (Page ID #7294–95).

Following Ogle's termination, SBSI authored a report detailing its investigation of Graf's complaint. R. 99-1 (Ex. to Graf Dep. at 128–34) (Page ID #1560–66). That report included findings of fact that Graf had entered the security office "through the side door in the boiler room to prevent being seen by any cameras"; that, although Graf had stated that Ogle raped her, Ogle "admitted to having consensual sex with Graf inside the Security Office and assured [his supervisors] the sex was not forced"; and that Ogle had informed Ingram and Lacy "that he was in possession of videos and pictures of him and Graf exposing themselves," which "were sent between both Graf and Officer Ogle." *Id.* at 131–32 (Page ID #1563–64). SBSI concluded, based upon their investigation, that "[t]here were no laws violated in this case," i.e., that Ogle did not sexually assault Graf. *Id.* at 133 (Page ID #156).

On November 5, 2021, a representative of MHHA's HR department, Edith Carmack, summoned Graf and informed her that HR had become aware of her complaint against Ogle. R. 266 (Trial Tr. II at 19) (Page ID #7719); R. 262 (Trial Tr. IV at 13) (Page ID #7419). Carmack asked Graf to tell her what had happened, and Graf gave a detailed verbal account of the alleged rape. R. 266 (Trial Tr. II at 19) (Page ID #7719); R. 262 (Trial Tr. IV at 13–14) (Page ID #7419–20). Carmack took notes throughout the meeting but did not have Graf make a written report. R. 266 (Trial Tr. II at 20) (Page ID #7720); R. 262 (Trial Tr. IV at 14) (Page ID #7420).

Because Ogle had already been terminated by the time Carmack learned of Graf's complaint, Carmack did not investigate the complaint against Ogle. R. 262 (Trial Tr. IV at 8,

10–11) (Page ID #7414, 7416–17).  However, according to Carmack, her interview with Graf had raised several "red flags," including that Graf had been in "an unauthorized area," i.e., the security room, and had "sn[uck] in" by avoiding cameras.  *Id.* at 19–20 (Page ID #7425–26). Carmack also noted that Ogle had told his supervisors, per their report, that the intercourse was consensual and "[t]hat he was in possession of videos and pictures of him and Graf exposing themselves." *Id.* at 20–21 (Page ID #7426–27).

On November 24, 2021, Carmack, having reviewed SBSI's report and Graf's statements, emailed her supervisor with a summary and recommendations as to whether Graf had violated the terms of her employment.  *Id.* at 22–24 (Page ID #7428–30).  Carmack's recommendation was that because "Ms. Graf, by her own admission . . . was on the clock and . . . had intercourse on company property, her employment should be ended." *Id.* at 24 (Page ID #7430).

Although, according to Graf, Carmack was "very sympathetic" at their first meeting and told Graf that "it wasn't [her] fault," not long after, Carmack's "whole demeanor changed."  R. 266 (Trial Tr. II at 20–21) (Page ID #7720–21).  When they met on December 9, 2021, Carmack "blam[ed] [Graf] for what happened" and made her "feel like what happened was [her] fault." *Id.* at 21, 24–25 (Page ID #7721, 7724–25).  Then, on December 15, 2021, Graf was again summoned to HR.  *Id.* at 25 (Page ID #7725).  Carmack informed Graf that "she was being let go because she was in an unauthorized area while on the clock and had intercourse on company property." R. 262 (Trial Tr. IV at 26) (Page ID #7432).

**B.  The Proceedings Below**

Graf filed suit against both MHHA and SBSI alleging claims of a hostile work environment and sexual harassment in under Title VII; retaliation claims under Title VII and the THRA; and a variety of common-law tort claims under Tennessee law.  R. 50 (3rd Am. Complaint) (Page ID #293–305).  The defendants moved for partial judgment on the pleadings, R. 53, R. 58, which the district court granted in part, dismissing SBSI as a defendant pursuant to the relevant one-year statute of limitations and dismissing several of Graf's tort claims.  R. 121 (Judgment on Pleadings Order at 28) (Page ID #3399).

Following discovery, MHHA moved for summary judgment.  R. 99 (Summ. J. Motion) (Page ID #1430–32); R. 106 (Summ. J. Mem.) (Page ID #2217–41).  The district court granted summary judgment in MHHA's favor in part, determining that there was no genuine dispute of fact as to Graf's sexual-harassment and hostile-work-environment claims or as to several of her tort claims.  R. 151 (Summ. J. Opinion at 10–13, 24–27) (Page ID #3719–22, 3733–36).  But the district court denied summary judgment as to Graf's Title VII and Tennessee Human Rights Act retaliation claims, as well as her common-law negligence and negligent-infliction-of-emotional-distress claims.  *Id.* at 14–24, 26–27 (Page ID #3723–33, 3735–36).  On MHHA's urging, the district court reconsidered its holding as to Graf's negligence claim and dismissed that claim as well.  R. 154 (Mot. for Reconsideration at 4–5) (Page ID #3744–45), R. 177 (Reconsideration Order at 2–6) (Page ID #4575–79).

Graf's case proceeded to trial on her remaining Title VII and THRA retaliation and negligent-infliction-of-emotional-distress claims.  Prior to trial, MHHA filed a notice pursuant to Federal Rule of Evidence 412 indicating its intent to seek the admission into evidence of Graf's sexual behavior, predisposition, and reputation.  R. 172 (Rule 412 Motion) (Page ID #4553).  The district court conducted an in camera hearing on the motion at which it reviewed the evidence MHHA sought to admit, namely, the explicit photographs and videos that Graf had sent to Ogle, as well as evidence of her communications with others about her sexual preferences.  R. 190 (In Camera Hr'g Minutes) (Page ID #4757).  Following the hearing, the district court issued an opinion and order determining that (1) evidence of Graf's communications with Ogle, including the explicit photographs, were admissible and were not excluded under Rule 412; (2) the explicit videos that Graf had sent to Ogle were inadmissible under Rule 412, but the basic facts surrounding the existence of such videos *were* admissible; and (3) evidence of Graf's private communications with those other than Ogle regarding her sexual preferences and predisposition were inadmissible under Rule 412.  R. 195 (Rule 412 Motion Op. at 18–19) (Page ID #4787–88).  Most importantly for the purposes of this appeal, the district court concluded that, although Graf's sexual-harassment claim had been dismissed, evidence pertaining to whether or not she had consented to the encounter with Ogle was relevant to determine whether Graf had "a reasonable and good faith belief that her allegations constituted a Title VII

violation," i.e., that the conduct she was reporting was rape and not consensual sex. *Id.* at 5–15 (Page ID #4774–84).

Trial began on July 30, 2024, and concluded on August 2, 2024. R. 236, R. 241 (Trial Minute Entries) (Page ID #5659, 5787). The trial was focused almost entirely on whether or not Graf had consented to the encounter with Ogle. On August 2, 2024, the jury returned a verdict in favor of MHHA on all counts. R. 243 (Verdict at 1–2) (Page ID #5793–94). The district court entered a judgment against Graf shortly thereafter. R. 245 (Judgment) (Page ID #5797). Graf timely appealed. R. 252 (Notice of Appeal) (Page ID #6983–84).

## II. DISCUSSION

On appeal, Graf challenges several of the district court's decisions allowing the introduction of evidence of her sexual history and preferences at trial. Specifically, Graf challenges (1) the district court's legal conclusion as to the scope of the "reasonable and good faith belief" requirement of a Title VII retaliation claim,[2] and (2) the district court's decisions to admit evidence of her sexual history and preferences both with respect to her interactions with Ogle, which the district court concluded fell outside the bounds of Rule 412, and outside of her interactions with Ogle, which the district court deemed admissible pursuant to exceptions to Rule 412. We address each assignment of error in turn.

## A. The Reasonable and Good Faith Requirement

Graf contends that the district court erred as a matter of law in concluding that, in order to establish her Title VII retaliation claim, she was required to prove her reasonable and good-faith belief that she was raped. According to Graf, the district court misinterpreted the statutory language and our caselaw in holding that an individual's belief in the veracity of their underlying sexual-assault claim is an essential element of a Title VII retaliation claim. For the reasons explained below, we disagree and conclude that the district court interpreted and applied the statute in a manner consistent with our precedent.

---

[2]Graf also brought a retaliation claim under the THRA, but because "Tennessee courts generally interpret the THRA in harmony with the relevant federal statutes," *Theus v. GlaxoSmithKline*, 452 F. App'x 596, 599 n.5 (6th Cir. 2011), and because both parties appear to view the two statutes as coextensive in this context, our analysis of Graf's Title VII claim serves as an analysis of her THRA retaliation claim as well.

## 1.  Standard of Review

This appeal arises from the district court's opinion and order adjudicating MHHA's motion seeking to admit evidence under Rule 412.  We generally review a district court's decisions regarding the admission of evidence for an abuse of discretion.  *Stackpole Int'l Engineered Prods., Ltd. v. Angstrom Auto. Grp., LLC*, 52 F.4th 274, 284 (6th Cir. 2022).  But Graf's first challenge on appeal is to the district court's legal conclusion as to the necessary elements of a Title VII retaliation claim stemming from a complaint of sexual assault.  We therefore review the district court's decision de novo.  *Consumers' Rsch. v. FCC*, 67 F.4th 773, 783 (6th Cir. 2023) ("We . . . review de novo questions of statutory interpretation and questions of law."); *see also United States v. Levy*, 904 F.2d 1026, 1029 (6th Cir. 1990) ("[A] district court's conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of the Federal Rules of Evidence, are reviewed de novo.").

## 2.  Scope of the Reasonable and Good Faith Requirement

To establish a prima facie retaliation claim under Title VII, a plaintiff "must demonstrate that:  '(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'"  *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 627 (6th Cir. 2024) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).  A plaintiff alleging retaliation under Title VII can allege that they engaged in one or both of two types of protected activity.  First, a complainant may claim that they "opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  Second, a complainant may allege that they "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *Id.*  "These two provisions, respectively, constitute the 'opposition' and the 'participation' clauses."  *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).  Graf alleges that she engaged in protected activity arising under the opposition clause only; that is, Graf's retaliation claim is premised upon her claim that she engaged in Title VII-protected activity when she complained to Ogle's supervisors that Ogle had raped her.  Neither party disputes that Graf's conduct in reporting her

rape was, indeed, opposition conduct. *See, e.g.*, *Jackson v. Genessee Cnty. Road Comm'n*, 999 F.3d 333, 344–45 (6th Cir. 2021) (opposition activity protected under Title VII includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices") (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)).

Although we have cabined the scope of activity constituting opposition conduct, "the lawfulness of the employment practice has been broadly construed." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). To that end, we have held that "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful." *Id.* at 1312–13. In the years since *Booker*, we have interpreted this language to mean that, in order to prove that they engaged in protected conduct, a retaliation claimant must demonstrate "that the opposition [was] based on 'a reasonable and good faith belief that the opposed practices were unlawful.'" *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (quoting *EEOC Compliance Manual*, (CCH) ¶ 8006); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) ("[I]n order to obtain Tile VII's retaliation protections, [the plaintiff] must have had a 'reasonable and good faith belief' that the harassing acts he was reporting were Title VII violations." (quoting *Johnson*, 215 F.3d at 579)); *Jackson*, 999 F.3d at 346 (stating that a Title VII retaliation complainant "must allege facts that she opposed unlawful [employer] practices . . . with a reasonable and good faith belief that the practices violated Title VII").

In holding that the protected-conduct element of a retaliation claim includes this reasonable and good-faith requirement, however, we have been careful to clarify that "the operative question is not whether [the complained of] conduct was actually unlawful, but whether Plaintiff held an objectively reasonable and good faith belief to that effect." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016). A retaliation claimant therefore "does not need to oppose actual violations of Title VII in order to be protected from retaliation." *Wasek*, 682 F.3d at 469; *see also Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) ("[A]n employee who opposes a hostile work environment need not prove that

the environment [she] complained of was actually hostile in order for the employee to receive protection from retaliation under Title VII.").

The dispute at the center of this case lies at the intersection of these two concepts. In alleging that MHHA retaliated against her for opposing sexual assault, Graf can succeed on her retaliation claim even if Ogle's conduct was not, as a legal or factual matter, sexual assault. But Graf must prove that she had a reasonable and good-faith belief that the conduct of which she complained was unlawful under Title VII. In other words, she must show that her belief that she was raped was reasonable and in good faith.

Our reasoning in *Wasek* is illustrative of the distinction between these two notions. There, we reviewed, on summary judgment, whether there was a genuine issue of material fact as to the plaintiff's alleged sexual harassment by his coworker while working on an oil rig. We concluded that the conduct of which the plaintiff had complained was not sexual harassment because he had failed to provide any evidence that he was harassed due to his gender. *Wasek*, 682 F.3d at 468–69. But we concluded that the plaintiff's claim nevertheless survived summary judgment because he had "suffered unwanted sexual touching and communication in the workplace on multiple occasions" and therefore "could have reasonably believed he was sexually harassed." *Id.* at 469–70.

Our opinion in *Montell v. Diversified Clinical Services, Inc.* is similarly instructive. 757 F.3d 497 (6th Cir. 2014). In that case, we evaluated whether there was a genuine issue of material fact as to whether the plaintiff, the program director at a clinical medical center, had satisfied the prima facie elements of her sexual-harassment retaliation claim where she had complained of sexual comments made by a supervisor. *Id.* at 504. Without analyzing whether the comments of which the plaintiff complained rose to the level of sexual harassment, we concluded that, because the comments "were sexual in nature" and the supervisor had "directed the comments to an employee reporting to him," the plaintiff "could have had a good-faith, reasonable belief that she was reporting unlawful sexual harassment." *Id.* at 504–05.

Here, then, Graf did not need to prove to the jury that the conduct she reported to Ogle's supervisor, and eventually to an HR representative, was, as a legal matter, a rape. But Graf was

required to demonstrate her reasonable and good-faith belief that Ogle's conduct violated Title VII. And MHHA was entitled to introduce evidence rebutting Graf's alleged good-faith belief in the purported violative conduct she had reported, including evidence that Graf had consented to the sexual encounter, because such evidence was directly relevant to the reasonableness of Graf's belief in whether Title VII prohibits that conduct.

Graf resists this conclusion by arguing that "there is no need to determine whether there was a good faith belief when a report of rape is so obviously a practice that is violative of Title VII." Appellant Br. at 30. But our inquiry is not whether a rape violates Title VII (it does)—our inquiry is whether Graf had a good-faith belief that Ogle raped her at work. Therefore, although we need not determine whether Ogle raped Graf, we must consider whether Graf "held an objectively reasonable and good faith belief" that she reported a legitimate rape. *See Braun*, 828 F.3d at 512.

To be sure, we have noted that a lack of reasonable and good-faith belief may stem from "an unreasonable mistake of law." *Wasek*, 682 F.3d at 469. And a retaliation plaintiff could make an unreasonable mistake of law by believing that conduct outside the scope of Title VII's protections was conduct falling within the statute's protections. But we have also stated that a plaintiff may fail to satisfy the reasonable and good-faith belief standard where "there are not facts from which a plaintiff could have reasonably believed that a violation occurred." *Id.* And while we have yet explicitly to so hold, several of our sister circuits have made clear that Title VII retaliation plaintiffs do not engage in protected conduct when they make a false, fabricated, or malicious complaint of unlawful conduct because such plaintiffs do not reasonably and in good faith believe in the truth of their complaint. *See Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) ("The opposition clause does not protect the making of a knowingly false allegation . . . . Rather, for an employee's report of information purportedly relating to a Title VII violation to be protected under the opposition clause, the employee must subjectively believe that the facts she is reporting are true."); *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) ("[I]t . . . cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment. To do so would leave employers with no

ability to fire employees for defaming other employees or the employer through their complaint when the allegations are without any basis in fact."); *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004) (holding "that utterly baseless claims do not receive protection under Title VII"); *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1175 (11th Cir. 2000) (holding that "false statements made under the opposition clause" are not protected and can be grounds for dismissal or discipline under Title VII); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1268 (5th Cir. 1992) (holding that the Fifth Circuit's application of Title VII "does not protect [a complainant] from the consequences of any misrepresentations that she made" in alleging sexual harassment).

Graf's case does not involve an unreasonable mistake of law. Both parties agree that Graf complained of a rape to her HR representative, and MHHA does not contest that it was reasonable for Graf to believe that a rape by a hospital security guard violated Title VII. Even so, Graf remains tasked with proving her reasonable, good-faith belief that the conduct by Ogle to which she was subjected constituted sexual harassment. The district court thus did not err in concluding that, in proving her retaliation claim to a jury, Graf was required to demonstrate that she reasonably and in good faith believed that, when she made her complaint against Ogle, she was reporting a rape. "Whether she actually held such a belief, a question of credibility," was necessarily "left to [the] jury." *Montell*, 757 F.3d at 505; *see also Braun*, 828 F.3d at 512.[3]

Having concluded that the district court did not err in interpreting the required elements of a Title VII retaliation claim, we offer a final note of caution. In the context of an allegation of sexual harassment or assault, a Title VII complainant must demonstrate her reasonable and good-faith belief that she was subjected to the alleged harassment or assault. In rebutting a plaintiff's reasonable and good-faith belief, a defendant employer may introduce evidence that the complainant believed the alleged sexual misconduct was consensual. But, in order to be relevant, such evidence must be narrowly tailored to the complainant's own belief in the consensual or nonconsensual nature of the alleged misconduct. Any evidence outside of that

---

[3]Notably, on appeal, Graf does not challenge either the jury instructions or verdict form, both of which made reference to the reasonable and good-faith requirement. *See* R. 243 (Verdict at 1) (Page ID #5793) ("1. Has Plaintiff proven by a preponderance of the evidence that Defendant terminated her because of a reasonable and good faith complaint of sexual harassment?"); R. 267 (Trial Tr. V at 72) (Page ID #7928) ("To succeed on her retaliation claim, . . . plaintiff must prove that her report of sexual harassment was based on a reasonable good faith belief that she was sexually harassed by Thomas Ogle."). Graf has therefore forfeited any such challenge.

narrow scope—for example, evidence that *others* disbelieved that the alleged misconduct was nonconsensual—would be entirely irrelevant. In addition, although a defendant employer may introduce evidence demonstrating that a sexual-assault complainant consented to the complained-of conduct, a defendant employer may not introduce evidence that a complainant consented to other sexual conduct on other occasions in an attempt to show that the complainant consented on the complained-of occasion. Evidence offered for such a propensity-based purpose—in order to prove a complainant's sexual proclivities and likelihood to engage in other sexual conduct—would be inadmissible under Federal Rule of Evidence 412. The category of evidence relevant to the reasonable and good-faith inquiry in this context is extremely narrow: in rebutting a retaliation complainant's reasonable and good-faith belief in the veracity of her sexual-harassment complaint, a defendant employer may introduce evidence only to demonstrate that the complainant's belief in the nonconsensual nature of the complained-of conduct was unreasonable or in bad faith.

Here, the district court adequately tailored its ruling on MHHA's evidentiary motion to allow only the introduction of evidence relevant to show that Graf could not have reasonably believed, or did not in good faith believe, that she had been raped. In doing so, the district court correctly interpreted Title VII's retaliation provision to include inquiry into Graf's reasonable and good-faith belief that she had been subjected to unwanted sexual conduct. The district court therefore did not err as a matter of statutory interpretation.

**B. Admission of Evidence of Graf's Sexual History and Predisposition**

Having concluded that the district court did not err in interpreting the required elements of Graf's Title VII retaliation claim, we turn to Graf's second assignment of error: that the district court abused its discretion in admitting evidence of her sexual history and predisposition. We conclude, that the district court committed no reversible error.

Federal Rule of Evidence 412 prohibits the admission of two types of evidence in cases involving sexual misconduct: "(1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition." Fed. R. Evid. 412(a). The second category, however, is subject to the exception, applicable only in civil

cases, that "the court may admit evidence offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed. R. Evid. 412(b)(2). And "[t]he court may admit evidence of a victim's reputation only if the victim has placed it in controversy." *Id.* The rationale behind this rule "is that evidence of a rape victim's prior sexual activity is of dubious probative value and relevance and is highly embarrassing and prejudicial." *See Bell v. Harrison*, 670 F.2d 656, 658 (6th Cir. 1982).

Graf contends that the district court erred in applying Rule 412 by allowing the admission of her communications with Ogle, including the explicit pictures she sent to Ogle and references included in her communications with Ogle about her involvement in the "BDSM lifestyle." *See* R. 195 (Rule 412 Motion Op. at 14) (Page ID #4783). And she argues that the district court erred in allowing the admission of evidence of her sexual history and predisposition outside of her interactions with Ogle. We address each argument in turn.

### 1. Standard of Review

As discussed above, we review a district court's decisions regarding the admission of evidence for an abuse of discretion. *Stackpole*, 52 F.4th at 284. "A court abuses its discretion when it relies on clearly erroneous factual findings, incorrectly applies the law, or uses the wrong legal standard." *Freed v. Thomas*, 137 F.4th 552, 557 (6th Cir. 2025).

### 2. Admission of Evidence of Graf's Communications with Ogle

Graf first argues that the district court abused its discretion in determining that evidence of her communications with Ogle, including the pictures she sent to Ogle, were admissible despite the limitations of Rule 412. According to Graf, the district court failed adequately to determine that the probative value of the proffered evidence substantially outweighed the danger of harm and unfair prejudice to Graf. But Graf seems to ignore that the district court determined that the proffered evidence did not fall within the ambit of Rule 412 and was thus not subject to the rule's heightened admissibility bar.

Rule 412 prohibits the admission of "evidence offered to prove that a victim engaged in *other* sexual behavior" in a proceeding "involving alleged sexual misconduct."**[4]**  Fed. R. Evid. 412(a)(1) (emphasis added).  Here, MHHA sought to introduce evidence of Graf's sexual communications with Ogle in order to demonstrate that she had consented to the sexual encounter.  The contested evidence was not introduced to prove that Graf engaged in other sexual behavior; instead, MHHA sought to introduce that evidence for the limited purpose of demonstrating that Graf consented to the sexual encounter at the center of her retaliation claim, i.e., the alleged rape.  Under these circumstances, the evidence of Graf's sexual behavior—i.e., her communications about her sexual preferences and the sexually explicit photographs of herself that she sent to Ogle—did not prove that she consented to "other sexual behavior" but this specific sexual behavior.  *See Warren v. Prejean*, 301 F.3d 893, 906 (8th Cir. 2002) (holding that, in a Title VII sexual-harassment lawsuit, evidence of a party's "statements concerning his own sexual history and preferences [was] not 'other sexual behavior' excluded by Rule 412" because, in introducing the evidence, the opposing party merely sought to discredit the party's claims that he had been sexually harassed); *see also* Fed. R. Evid. 412(a) advisory committee's note to 1994 amendments ("The word 'other' is used to suggest some flexibility in admitting evidence 'intrinsic' to the alleged sexual misconduct."); 23 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, *Federal Practice and Procedure* § 5374.1 (2d ed. 2025) ("The sexual behavior excluded by Rule 412(a)(1) must be 'other' sexual behavior . . . . [T]his means 'other' than the 'alleged sexual misconduct' that brings a given civil or criminal proceeding involving that misconduct within the scope of Rule 412.").**[5]**  Thus, in allowing MHHA to introduce

---

**[4]**Graf also makes the argument that because this case proceeded to trial on her retaliation claim alone, and not her sexual-harassment claim, this case did not "involve[e] . . . sexual misconduct" and thus any evidence of her sexual history or predisposition was irrelevant and inadmissible. *See* Fed. R. Evid. 412(a).  But even though Graf's sexual-harassment claim was dismissed at summary judgment, her retaliation case still *involves* sexual misconduct: she alleges that she was retaliated against for making a complaint of sexual assault. *See, e.g.*, *Involve*, Merriam Webster's Collegiate Dictionary (10th ed. 1995) ("[T]o have within or as part of itself").  Even though Graf did not have to prove at trial that she was sexually assaulted, her case still involved a sexual-assault allegation.  Evidence as to the sexual assault of which Graf had complained was therefore not per se inadmissible.

**[5]**Critically, however, had MHHA sought to introduce the contested evidence in an effort to prove that Graf engaged in sexual conduct other than the alleged rape—i.e., that she had consented to sexual encounters before or after the alleged rape—such evidence would fall within the scope of Rule 412(a)(1) and would be subject to the heightened balancing test required by Rule 412(b)(2).  So, for example, MHHA would have had to show that the probative value of its proffered evidence substantially outweighed the danger of harm to the victim and of unfair

evidence of Graf's sexual behavior in the form of her communications with Ogle to demonstrate her consent to the alleged rape, the district court did not abuse its discretion by concluding that such evidence was offered to prove Graf's "other sexual behavior" and therefore did not fall within the ambit of Rule 412.

To the extent that evidence of Graf's communications with Ogle might be offered to prove Graf's sexual predisposition—i.e., that her communication about her involvement in the BDSM and her self-identification as submissive with Ogle made it more likely that she would consent to sexual contact in general—such evidence would fall within the ambit of Rule 412. Fed. R. Evid. 412(a)(2). And evidence offered for such a propensity-based purpose would be subject to the stringent balancing test set forth in Rule 412(b)(2). As discussed below, however, any evidence of Graf's references to the BDSM community and her identification as generally submissive was admitted at trial for the narrow, non-propensity purpose of demonstrating Graf's consent to the specific encounter with Ogle. No evidence was offered to prove Graf's sexual predisposition. The district therefore did not err with respect to its decision to allow the introduction of evidence of Graf's communications with Ogle.

### 3. Admission of Evidence of Graf's Reputation, Subsequent Sexual History, and Past Sexual Trauma Under Rule 412's Exceptions

In addition, Graf argues that the district court erred in admitting evidence of her sexual behavior outside of her interactions with Ogle pursuant to the exception to Rule 412 for civil cases. *See* Fed. R. Evid. 412(b)(2) ("In a civil case, the court may admit evidence offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party. The court may admit evidence of a victim's reputation only if the victim has placed it in controversy."). According to Graf, the district court abused its discretion in allowing the introduction of evidence of her sexual behavior and predisposition outside of her interactions with Ogle because the probative value of such evidence did not substantially outweigh the risk of harm to Graf.

---

prejudice to any party were it to attempt to introduce the same evidence to show that Graf engaged in other sexual encounters with Ogle (or anyone else).

And Graf argues that any evidence as to her reputation for sexual behavior was inadmissible because she did not place her reputation in controversy.

Beginning with evidence of Graf's reputation, it is unclear from the record and Graf's briefing to what evidence she is referring. The district court barred the introduction of any evidence of Graf's "private communications regarding her sexual preferences or predisposition" with any of her co-workers or SBSI security guards other than Ogle, R. 195 (Rule 412 Motion Op. at 19) (Page ID #4788), concluding that such evidence was "precisely what Rule 412 prohibits—evidence of sexual predisposition, offered to suggest that because Graf was generally interested in a certain type of sexual activity, . . . she must have welcomed it from Ogle," *id.* at 14 (Page ID #4783). MHHA was therefore barred from introducing such evidence at trial, and Graf has not pointed us to the admission of any such evidence.

The only evidence going to Graf's reputation introduced at trial, then, was evidence related to Graf's discussion of the BDSM lifestyle and her general sexual preferences with Ogle. But this evidence was not offered to show Graf's reputation for sexual behavior; instead, it was offered in the limited context of demonstrating Graf's consent to the encounter with Ogle. *See* R. 262 (Trial Tr. IV at 166) (Page ID #7572) ("Ladies and gentlemen, you've heard testimony of a sexual nature, including testimony and photographs regarding BDSM and the lifestyle. This evidence is to be considered only for the limited purpose of determining whether plaintiff reasonably and in good faith believed that her encounter with Thomas Ogle was sexual harassment . . . You may not consider it for any other purpose."). Because evidence of Graf's sexual preferences was introduced for the non-propensity purpose of demonstrating her consent to the alleged encounter, not her reputation for sexual behavior, Rule 412(b)(2) did not apply.[6]

Next, although Graf contends that the district court erroneously admitted evidence to prove that she engaged in other sexual behavior without applying the proper test, the record does not reflect that the district court admitted any such evidence. As previously discussed, the district court allowed evidence of Graf's sexual behavior with only Ogle, barring any evidence of

---

[6]If this evidence *had* been introduced for the purpose of proving Graf's reputation for sexually promiscuous behavior or the like, however, it would have been inadmissible because Graf did not place her reputation in controversy. *See* Fed. R. Evid. 412(a)(2), (b)(2).

her discussions about her sexual behavior with others. Additionally, the evidence of Graf's sexual behavior that was admitted—evidence of her involvement in the BDSM lifestyle—was not offered to prove that she engaged in other sexual activity, but to show that she consented to the sexual assault of which she had complained. Once again, then, this evidence fell outside the ambit of Rule 412.

Finally, MHHA notes that any evidence of Graf's past trauma in romantic relationships and of her subsequent romantic relationship was properly admitted. But Graf does not appear to challenge the admission of either type of evidence, either in her initial brief or in her reply. Graf has therefore forfeited any challenge to the district court's admissions of her past trauma and subsequent romantic relationship. *See, e.g.*, *Hieber v. Oakland County*, 136 F.4th 308, 320 n.2 (6th Cir. 2025) ("[B]ecause [appellant] fails to argue that the district court erred . . . [s]he forfeited any challenge to the district court's order.").

In sum, the district court committed no reversible error in admitting certain categories of evidence falling outside of the scope of Rule 412. We therefore affirm each of the contested evidentiary decisions.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in interpreting the retaliation provision of Title VII to require Graf to prove at trial her reasonable and good-faith belief that she had been subjected to conduct made unlawful under the statute. And we find no reversible error in any of the district court's evidentiary decisions admitting certain, narrow categories of evidence pertaining to Graf's sexual conduct regarding her interactions with Ogle. We therefore **AFFIRM**.